## LOUIS–DREYFUS et al. v. PATERSON STEAMSHIPS, Limited.
### No. 8.

Circuit Court of Appeals, Second Circuit.

Nov. 6, 1933.

See, also, 35 F.(2d) 353.

Bigham, Englar, Jones & Houston, of New York City, and Burke & Desmond, of Buffalo, N. Y. (Henry N. Longley, Thomas C. Burke, and Ezra G. Benedict Fox, all of New York City, of counsel), for appellants.

Frederick L. Leckie and Holding, Duncan & Leckie, all of Cleveland, Ohio, for appellee.

Before L. HAND, SWAN, and MACK, Circuit Judges.

L. HAND, Circuit Judge.

This case now comes before us after a second trial following our decision reported in 43 F.(2d) 824, 72 A. L. R. 242. The judge had originally dismissed the libel, and we should have sustained his decree except for some testimony that the pumps of the "Advance" were so rigged that the only suction in the cargo hold was from a pump in the engine room. Two expert witnesses had said that this made the ship unseaworthy, and the respondent had not contradicted their testimony. We felt bound, therefore, to allow this issue to be tried. The parties interpreted our words a little more broadly than we intended, and the evidence on the second trial was directed not only to the pumps, but to the bulkheads and valves in general. At the conclusion of the proof, the judge found the ship seaworthy as to all these, and again dismissed the libel. Since our opinion this court has decided the case of May v. Hamburg, 63 F. (2d) 248, and held, or at least intended to lay down, that section 3 of the Harter Act (46 USCA § 192) excused faults of navigation, if the owner used due diligence to make the ship seaworthy as to all that could have contributed to the damage; but that seaworthiness irrelevant to the loss was not a condition precedent to the excuse. The question had perhaps been unsettled in this court, and although all of us now sitting are of another mind, we will follow May v. Hamburg, until the Supreme Court, which now has the case before it on certiorari, settles the point. Had the pumps been actually out of repair, the damage might have resulted from their neglect. But this was not true; they were all set in motion and could not control the leak. They were not, as the engineer supposed, in fact rigged so that the engine pump alone sucked the cargo hold. · And for that matter that pump continued to work until the ship was tied up, and it became apparent that the leak was too great to be kept down. Any leak in the bulkheads served at once to protect the grain from the water entering the cargo hold, and to allow the suctions in the fore peak and the engine room to assist.

Thus, if May v. Hamburg be right, the libellant loses.

· We might rest the case on this, but should that decision be reversed, we should have to decide as to the general seaworthiness of the ship, and as we think that the respondent has carried the burden of proof on that issue anyway, we can finally dispose of the suit now.

■ As we have said, there were suctions to the cargo hold operated directly from the boilers. Indeed, the libellant does not appear to dispute this; if it does, its position is clearly untenable. It does insist, however, that there was no proof that the pumps were in good condition, or that the bulkheads were proper. As to the pumps, two of the libellant's witnesses had inspected her in the spring of 1927, a few months before the strand. While their attention was not specifically directed to the pumps, still they found them in good condition. Three years later, during which she had been out of commission, one of these witnesses re-examined her and three more for the first time. They said that the pumps appeared to be still in sound shape. The libellant called two witnesses; one of these had examined the "Advance" shortly after she went ashore, though not with this point in mind, and both re-examined her three years later. They found the pumps in bad condition, and thought that the defects had existed when the ship broke ground. The question is one on which we must accept the decision of the judge who saw the witnesses, even if there had been no testimony that after the strand all the pumps worked properly.

■ A more difficult question arises from the condition of the bulkheads. There were two of these; one at the forward end of the cargo hold, which made a fore peak, the other separating the cargo hold from the engine room. When the ship was examined in 1930 it was found that these had separated along the skin of the ship, in some cases as much as six inches, so as not to be water-tight. Whether this condition existed when the ship broke ground, is left in some doubt; but, as the respondent has the burden, we will assume arguendo that it did. There was a dispute whether in a wooden ship iron bulkheads can be made water-tight; but even if they cannot, it does not follow that such wide cracks are tolerable. We think that bulkheads in such condition as we assume these to have been, would be unseaworthy, if more than cargo partitions were necessary at all. Upon that issue the experts also disagreed; the libellant's insisting that water-tight bulkheads were necessary; the respondent's say-

ing that in a "composite" ship like the "Advance," they were not. Though there were no statutory or administrative rules requiring such ships to be so equipped when used in lake travel, those in the "Advance" must have been originally intended to be more nearly tight than they later became. However, this is irrelevant, if the law imposed upon the owner no duty to have anything but cargo partitions. The ship was seaworthy if she conformed to the requirements of her class and service, even though her owner failed to keep her up to a higher standard which he had gratuitously assumed. The British King (D. C.) 89 F. 872, affirmed on opinion below, 92 F. 1018 (C. C. A. 2). It is true that two of the respondent's witnesses testified on cross-examination that if there were bulkheads, they should be kept as tight as possible. Possibly they meant that they would not pass her otherwise, though they did not expressly say so. But in any case they repeatedly said that there was no need of water-tight bulkheads, and we cannot read their testimony as a whole to mean that the "Advance," even with her bulkheads leaking, was unfit for her service. Of course a ship with compartments is safer than one without; especially is this true of the fore peak where collisions are most likely. Probably this was the only bulkhead important in the "Advance," which could scarcely have lived with either her cargo hold or her engine room flooded. But owners are not obliged to construct ships of the highest safety; seaworthiness is a resultant of the added safety from the supposed device and its cost; ordinarily it depends upon the standard generally accepted in the trade for which the ship is used, though certainly in the end the court sets the standard. The T. J. Hooper, 60 F.(2d) 738, 740 (C. C. A. 2). There does not seem to us occasion here to advance beyond the accepted requirements. With passenger ships it might well be different, but here we have a question of property alone. Moreover, the Lakes are not like the high seas. "Composite" vessels, like wooden ones, had by 1927 been generally displaced by steel on the Lakes; but they were still passed to carry cargo, as they had done for many decades before, notwithstanding the absence of any water-tight compartments. We are not prepared in this instance to overrule the opinion of the calling, and say in effect that such ships must be retired.

The libellant finally argues that the "Advance" was unseaworthy, because her chief engineer did not know that she had suctions leading from the cargo hold to pumps harnessed directly to the boilers. The Elkton, 49 F.(2d) 700 (C. C. A. 2). He so swore and probably so understood in August, 1927, though his testimony was given eighteen months after the accident. The second engineer was properly advised in any event, and would probably have undeceived his chief, had he failed to start all pumps. But quite aside from this, the point is ill taken anyway. The theory back of the doctrine is that the ship's sufficiency depends not only on her gear but on the presence of a crew so informed as to be able to handle it; and it seems to us extravagant to suppose that in an emergency a master or an engineer would not start all the pumps available. This was especially the case in the "Advance" which had limbers through the bulkheads. Indeed, the event proved the truth of this, for all pumps were started after the strand. Therefore, even if the engineer did not know the actual rigging of his pumps, his ignorance was not a vital element in the general competence of the personnel on board.

It does not seem to us necessary to discuss the other points raised. We see no ground to upset the conclusions of the judge upon the sharply contested issues before him.

Decree affirmed.