**PETER PAUL, Inc., et al., Libellants,**
and
**Western Hardwood Lumber Co. et al., Libellants and Cross-Respondents,**
v.
**THE M.S. CHRISTER SALEN, her engines, etc., Rederi A/B Pulp, Claimant-Respondent and Cross-Libellant**
and
**Rederi A/B Jamaica, D/S A/S Eikland and Salamis A/S, Respondents.**

United States District Court
S. D. New York.

June 19, 1957.

Bigham, Englar, Jones & Houston, New York City, for libellants. Henry N. Longley, John W. R. Zisgen, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for claimant-respondent, respondents and cross-libellant. Wharton Poor, Charles S. Haight, James McKown, Jr., R. Glenn Bauer, New York City, of counsel.

McGOHEY, District Judge.

The libellants in twenty-three consolidated causes seek damages for the loss of, or injury to, cargo which resulted when the M/S Christer Salen broke in two while on a voyage from Japan to Pacific coast ports in Canada and the United States. Their claims are against the ship and the owner.

The latter filed a cross-libel against saved cargo and its owners for general average contributions. The respondents are three shipowners alleged to have been in partnership with the owner.

The parties stipulated to try here only the claim of Peter Paul, Inc. for lost cargo and the owner's claims for general average. All other issues raised by the pleadings are deferred.

The owner seeks exemption from liability on the ground that the loss resulted from an excepted cause under the Carriage of Goods by Sea Act.[1]

### Facts

1. At all material times the libellant Peter Paul, Inc. was a Delaware corporation.

2. At all material times this libellant was the owner of a shipment of 4,104 bags of desiccated coconut (macaroon) shipped by Peter Paul Philippine Corporation on board the Christer Salen at Manila, Philippine Islands, under bill of lading No. M–1–SFO, dated January 30, 1951, consigned to order, notify Peter Paul, Inc., at San Francisco by rail to overland to common point.

3. This entire shipment was lost at sea on February 15, 1951, with the Christer Salen's forward part which broke off and sank.

4. Freight on the shipment was paid.

5. Those libellants who have been sued as cross-respondents for contribution in general average had at all material times the status, corporate or otherwise, alleged in the libels and are

1. 46 U.S.C.A. § 1300 et seq.

the parties entitled to sue for such damages as may have been sustained with respect to their respective shipments, as alleged in the libels, and the parties liable to pay such amounts, if any, as may be due with respect to their respective shipments by way of general average contribution and/or special charges, as alleged in the cross libels.

6. By stipulation, proof of the status corporate or otherwise of all libellants not mentioned in the foregoing findings, and their ownership of the respective shipments, as alleged in the libels, has been postponed until after the trial.

7. By stipulation, proof by all of the libellants other than Peter Paul, Inc., of the fact of damage with respect to their respective shipments, as alleged in the libels, has been postponed until after the trial.

8. By stipulation, determination of the extent of the damage, if any, sustained by the libellants with respect to their respective shipments, as alleged in the libels, and the amount of general average contribution and/or special charges, if any, to be paid by the cross-respondents with respect to their respective shipments, as alleged in the cross-libels, has been postponed until after the trial.

9. At all material times Rederi A/B Pulp, the claimant-respondent and cross-libellant, was a corporation duly organized under the laws of the Kingdom of Sweden, and was the owner of the Christer Salen.

10. On May 24, 1947, the claimant-respondent and respondents entered into a joint cargo service agreement known as the "Salen-Skaugen Line Far East Service Agreement," which they amended on December 2, 1949. Among other things, the agreement as amended provides (1) that Rederi A/B Pulp shall act as manager of the service with full power of appointment of agents to handle the vessels of all parties; (2) that profits and losses shall be divided in accordance with a table set out therein; and (3) that each party agrees to defend, indemnify, and hold each other party harmless against and from any and all claims asserted against each such other party by persons not party to the agreement and arising out of or in any manner connected with the use of such indemnifying party's vessels in such service. This agreement was in full force and effect at the time of and with respect to the voyages of the Christer Salen described in the libels.

11. All of the bills of lading, which constituted the contracts of carriage of the shipments described in the libels and cross-libels, were signed for and on behalf of Rederi A/B Pulp and the Christer Salen by their respective duly authorized agents. All bills of lading contained a Jason clause.

12. The Christer Salen was built at the Eriksberg Shipyard at Gothenberg, Sweden. Her keel was laid on February 2, 1944. She was launched in September, 1944 and completed in February, 1945, but was not put into service until June, 1945. All of her hull and deck plates were welded one to the other, but the plates were attached to the frames by rivets.

13. The vessel was classed 100 A-1 by Lloyd's Register of Shipping (hereafter called Lloyd's) and remained so until February 15, 1951 when she broke in two at sea.

14. In January, 1950 the vessel ran ashore on Silino Island in the Philippines, seriously damaging her fore foot. Her repairs were put in charge of a Mr. Gunnar Hjernquist, an engineer and ship surveyor of Gothenberg, Sweden, who went to Manila and made arrangements for temporary repairs after which the vessel proceeded to Gothenberg for permanent repairs.

15. The repairs were made at the Eriksberg Shipyard in Gothenberg. They were supervised by Mr. Hjernquist and Mr. Bertrand Grauers, a Lloyd's surveyor. After completion of the repairs, the usual certificates were issued confirming that all damage had been repaired and stating that the Christer Salen was considered seaworthy.

16. In May, 1950 the vessel left Gothenberg, under command of Captain Gunnar Batelsson, and proceeded to the Far East via Suez. In the Philippines and nearby ports she loaded cargo for the West Coast of North America. She sailed from Yokohama on September 29, 1950, on the Great Circle route for Vancouver, British Columbia, where she arrived on October 12, 1950.

17. After loading a cargo for Japanese and other Far Eastern ports, the vessel sailed from Vancouver for Kobe on November 21, 1950.

18. During January 6 to 8, 1951 the vessel was drydocked in Hong Kong and inspected by a Lloyd's surveyor, who issued a certificate recommending that her 100 A–1 class be continued.

19. She then sailed for Philippine ports where cargo was loaded for ports on the West Coast of Canada and the United States towards which she then proceeded via Japan.

20. The bills of lading all incorporated the United States Carriage of Goods by Sea Act (46 U.S.C.A. § 1300 et seq.). However, the Hong Kong Carriage of Goods by Sea Ordinance, 1928, was applicable to seven shipments made from the Crown Colony of Hong Kong to Vancouver, B. C. The Hong Kong Carriage of Goods by Sea Ordinance, 1928, contained substantially the same provisions and exemptions from liability as are contained in the United States Carriage of Goods by Sea Act.

21. On February 14, 1951, at 5:12 P.M., the vessel sailed from Yokohama, her last Japanese port, for Vancouver, B. C. and United States ports. Her draft was then 21′06″ forward and 25′02″ aft. Shortly after sailing, she took on board 250 tons of water ballast to put her propeller deeper in the water.

22. During the afternoon and night of the 14th and up until about 4:15 P.M. on the 15th, the vessel encountered heavy weather. There was a snowstorm and freezing temperature. There was a heavy sea from the north-north-east (changing to north on the morning of the 15th), and the vessel was pitching, rolling and shipping some water. The wind was undoubtedly strong but how strong it is impossible to say. The log entries are not reliable. The rough log gives the force as 12 on the Beaufort scale. The smooth log written up after the accident gives it as 10. Neither entry was signed. I do not accept either entry. The storm had started before the vessel which carried a few passengers as well as cargo, left port. At about 9:00 P.M. on the 14th, she was hove to and her speed reduced. On the morning of the 15th the lashings of deck cargo aft of the bridge loosened. However, the crew were able safely to correct this and secure the cargo when the ship's course was changed to accommodate her to the sea. Except for this, there was no damage to gear or cargo and no injury to passengers or crew during the heavy weather. The owner certainly did not prove that the weather was any worse than a well found and properly manned ship should be able to withstand; or indeed that it was any worse than her experienced master expected when he left port.

23. At about 4:15 P.M. on February 15, the weather moderated and the master ordered full speed ahead, it being understood, however, by both the master and the chief engineer that this meant only 80% of actual full speed because of the risk of engine damage if she proceeded at actual full speed in the existing seas. During dinner at 6:00 P.M. the guardrails which are put up during bad weather to keep the dinnerware on the table were not used.

24. The evidence does not indicate that, under the circumstances, the master's speed order was improper. He was a man of long experience and, as the events at and following the accident show, resourceful and competent in an emergency.

25. At about 6:45 the master and chief mate having finished dinner, which was taken with the passengers, went to the bridge. The master remarked that the vessel was riding well. Suddenly they heard "a scraping sound" and "felt

a bump" and saw the derricks on the fore part of the deck move forward. In less than thirty seconds the vessel had broken in two at a point about the middle of the number 3 hatch. The master immediately sounded the signal for passengers and crew to take lifeboat stations. He also ordered radio distress signals sent out.

26. The forward part of the vessel and the cargo therein were carried off and sank. The after part remained afloat. Although neither gear nor deck cargo on that part was damaged, the vessel or what was left of her was in imminent peril.

27. On the morning of the 16th, the master decided to abandon the voyage to Vancouver and the United States and to seek refuge in Yokohama. He navigated the after part of the vessel under her own power at low speed to that port which was reached on the 18th. As soon as was possible after arrival, the remaining cargo was discharged and the ship drydocked. She was thereafter fitted with a temporary bow, and in June 1951 sailed for a German repair yard, at which permanent repairs were made.

28. The master testified that just before the vessel broke he and the chief mate noticed off the port bow one wave, much larger than the rest, approaching the ship. Neither log records this. As already noted, the smooth log was written up on the voyage back to Yokohama during which the events which had occurred at the time of and preceding the accident were recalled and discussed by the master and his officers. It seems altogether incredible that if this wave were of such size and violence as to constitute a peril of the sea as the owner now contends, it would have gone unrecorded. I find it was not of such size or violence.

29. The fracture started in one of the plates of the starboard sheer strake at a point somewhere between the top of the strake and the deck weld, a distance of about 7½ inches. It was what is called a "brittle fracture."

30. In order for ship's steel to fracture in this manner, three conditions must exist: (a) there must be a "notch" in the steel at which a fracture may originate; (b) the temperature must be sufficiently low to make the steel notch brittle; (c) the steel must be subjected to stress.

31. A notch may consist of a cut, a crack, however minute, or similar damage to a plate; a discontinuity in design or in a weld; an internal lack of homogeneity in the steel.

32. The starboard sheer strake of the Christer Salen was notch brittle at 30°F., and her starboard stringer plate was notch brittle at 70°F. The notch brittleness found in these plates was not unusual for plates rolled in Germany at the time these were.

33. The temperature encountered by the Christer Salen on February 15, 1951 was such as was to be expected and it was low enough to make her steel brittle.

34. The seas and wind encountered by the Christer Salen on February 15, 1951 were such as were to be expected and they exerted a stress on the starboard sheer strake.

35. The fracture started at a notch in the sheer strake plate. The notch was present when the plate was put into the vessel and made her unseaworthy when she sailed from Yokohama.

36. At and prior to July 1943, when the plates subsequently incorporated in the Christer Salen were rolled, the then known tests for ship's plates were not designed to, and in fact did not, disclose the existence or non-existence of notch brittleness in such steel.

37. The steel used in building the Christer Salen complied with all of Lloyd's then existing requirements. At the time of the accident the vessel was classed 100-A-1.

38. The notch constituted a latent defect which the owner could not discover by means of any known or customary test.

39. In 1950 and for some years prior it was generally known to persons engaged in the building and classification of ships that (a) existing tests did not dis-

close the existence or non-existence of notch brittleness in ship's steel; (b) steel in existing ships might be notch brittle; and (c) a fracture initiated in a plate of a welded ship presented the danger that the ship might break in two.

40. The large-scale construction of all-welded ships was begun in the United States during World War II. Most of the ships so produced were dry-cargo freighters of the so-called "Liberty" type. A serious problem arose out of numerous instances in which ships of this type suffered fractures. A Board of Investigation appointed by the Secretary of the Navy stated in a report dated July 15, 1946, that the factors responsible for failures in welded ships built in the United States were weaknesses in (a) design, (b) workmanship, and (c) material. This report further stated that, "until experience can be had with vessels constructed under normal conditions, of improved design, with carefully checked, high quality workmanship, and employing steel of low notch sensitivity, some form of crack arresters, i. e. two or more slots cut in the deck or sides of the ship covered with plating that is riveted in place—should be incorporated in all large welded vessels."

41. Crack arresters do not prevent the occurrence of cracks in ships, nor do cracks always stop at an arrester.

42. By 1950 the United States had installed crack arresters in less than half of its completely welded vessels built during World War II.

43. The American Bureau of Shipping did not then and does not now require the installation of crack arresters in welded vessels which were built without them. Neither does it require crack arresters in new buildings.

44. The information as to welded ships which was gathered in the United States was communicated to those in Great Britain interested in the subject, including the Admiralty Ship Welding Committee and Lloyd's.

45. Lloyd's rules, up to the time of this disaster, did not require the owner of the Christer Salen to fit her with crack arresters, nor did Lloyd's suggest that crack arresters be installed during the repair of the stranding damage in 1950.

46. The installation of crack arresters on the Christer Salen in the usual manner while she was being repaired at Gothenberg in 1950 would have cost about $10,000.

47. The Christer Salen was the first completely welded dry cargo ship classed with Lloyd's that cracked in two.

48. Lloyd's considered installation of crack arresters inadvisable for welded ships built in Britian and in Sweden because (1) such ships had been built without the difficulties encountered in building Liberties in the United States, i. e. poor design, inexperienced workmen, and use of notch sensitive steel which resulted from a shortage of manganese in the United States and in turn resulted in ship steel with an excess of carbon; (2) Lloyd's believed that the work of installing crack arresters might create notches in the ship's plates which could be the starting points of fractures.

49. The nature of the damage sustained by the Christer Salen in the Silino stranding, in the opinion of Lloyd's experts, proved that her steel was not brittle but ductile. The plates of the Christer Salen were only one-half as thick as those in Liberty ships and thus were less likely to crack.

50. The master of the Christer Salen had not been informed by the shipowner, nor did he have any independent knowledge, that the danger of fracture was greater in a welded ship than in a riveted ship. This circumstance had no causal relation to the accident.

51. The fracture of the Christer Salen did not result from any damage to her plates during loading or from improper stowage of her cargo.

The libellants do not contend that the owner's failure to discover the defect in the starboard sheer strake plate constituted lack of due diligence. They contend rather that in light of the "mass of data known to all those interested in

shipping, long before 1950, establishing the dangers presented by a welded ship; * * * in the exercise of ordinary prudence, Lloyd's, as the vessel owner's agency which it employed to make the vessel seaworthy, should have required the installation of crack arresters when the vessel was being repaired at Gothenberg in 1950"; that Lloyd's was negligent in failing so to require and its negligence "was lack of due diligence by the vessel owner."

■ These contentions are rejected. There was, it is true, considerable data concerning the failures of welded ships built in the United States. However, as the findings show, that data revealed conditions as to design, workmanship and quality of steel in the American ships which Lloyd's, for adequate reasons, concluded did not obtain in welded ships such as the Christer Salen. The studies of welded ship failures in the United States showed that the steel in those ships was brittle because it contained an excess of carbon over manganese; and being one inch in thickness was more likely to crack than thinner steel. Lloyd's found in 1950 upon examining the Christer Salen's steel damaged in the stranding, that it was not brittle but ductile. And it was only one-half inch thick. Moreover, at that time no dry cargo ship such as the Christer Salen classified by Lloyd's, had ever suffered a fatal fracture. Lloyd's experts studied all the data on ship fractures compiled by both the United States and Britain. They came to the conclusion that the defects in material and design which were the chief causes of failure in the United States Liberties, were absent in ships built in Sweden at the time of the Christer Salen's construction. Furthermore, they then believed that the work of installing crack arresters in existing ships could and might produce notch effects in their plates which in turn could and might initiate fractures. These conclusions were not arrived at arbitrarily

or carelessly but after serious extended study. Indeed their views found considerable support in the fact that the Americans had not installed crack arresters in at least half of all existing Liberty ships and in the further fact that the American Bureau of Shipping did not require their installation in existing welded ships. In these circumstances there is no reasonable basis for holding Lloyd's negligent in following the views of their own experts rather than others.[2]

■ The libellants further contend that since the shipowner may not delegate its duty to exercise due diligence, its reliance on Lloyd's is not enough to exempt it from liability. The argument is that since the owner itself knew or is charged with knowing all of the data gathered in the United States, in light of that data, Lloyd's views to the contrary notwithstanding, the owner in the exercise of due diligence should have ordered the installation of crack arresters when the vessel was being repaired in 1950. This argument seems to me to read "due diligence" out of the statute. In view of the sharp difference of opinion between Lloyd's experts and some, though not all, American experts, I think common prudence dictated that the owner rely on the judgment of those experts under whose supervision its vessel had been built and repaired and who regularly surveyed and passed it for classification as a seaworthy vessel.[3] Mr. Murray testified that if the owner had proposed installing crack arresters in 1950, Lloyd's, in his opinion, would have disapproved. This the libellants urge should be disregarded as "speculation * * * advanced in defense of Lloyd's without any reasonable basis." I think, on the contrary, that this opinion has a very reasonable basis. Indeed, disapproval of such a proposal by the owner, appears to be the only position Lloyd's could have taken consistent with the views of its experts. Mr. Murray impressed me as highly competent and

2. See Louis-Dreyfus v. Paterson Steamships, Ltd., 2 Cir., 67 F.2d 331, at page 333.

3. See Balfour, Guthrie & Co., Ltd. v. American-West African Line, 2 Cir., 136 F.2d 320, at page 321; The Troubador, D.C., 98 F.Supp. 207, at page 210.

equally trustworthy. He was, to be sure, defending Lloyd's and his own position. But on both direct and cross-examination he obviously tried to be objective, frank and entirely fair. The reasons he gave for this and other opinions seemed to me altogether plausible and reasonable. I accept his opinion.

█ In 1954, it is true, Lloyd's amended its rules so as to require that all-welded vessels be fitted with some crack arresting device. This, however, as libellants concede, does not show negligence in not requiring such devices in 1950.

I am satisfied that, under all the circumstances existing in 1950, Lloyd's was not negligent in taking the position it did at that time and that the owner exercised due diligence to make the Christer Salen seaworthy.

█ It follows from the foregoing that the owner is entitled to general average contributions from the saved cargo. Determination of the amount of such contributions will be referred to a Commissioner if the parties are unable to agree on it.

Submit on notice a proposed decree in accordance herewith.