**ASIATIC PETROLEUM CORPORA-TION et al., Plaintiffs,**

v.

**S. S. AMERICAN TRADER, her engines, boilers, etc., and American Trading and Production Corporation, Defendants.**

**No. 66 AD 131.**

United States District Court, S. D. New York.

Jan. 3, 1973.

Bigham, Englar, Jones & Houston, New York City, for plaintiffs; James H. Simonson, Nicholas E. Monsour, New York City, of counsel.

Burlingham, Underwood & Lord, New York City, for defendants; Eugene Underwood, Robert B. Pohl, Frank L. Wiswall, Jr., New York City, of counsel.

## OPINION

BONSAL, District Judge.

This is a suit in admiralty to recover damages for the loss and contamination by sea water of a cargo of lubricating oils during carriage aboard the S. S. AMERICAN TRADER ("AMERICAN TRADER") from Texas ports to Bombay. Jurisdiction is based on 28 U.S.C. §§ 1333, 1337. Plaintiffs are Asiatic Petroleum Corporation ("Asiatic"), charterer of the AMERICAN TRADER; Burmah Shell Oil Storage & Distributing Co. of India, Ltd. ("Burmah Shell"), the owner of the cargo at all times herein relevant; and Great American Insurance Company ("Great American"), the marine insurer of the cargo. Defendants are the AMERICAN TRADER, and the American Trading and Production Corporation ("ATACORP"), the owner and operator of the AMERICAN TRADER at all times herein relevant.

Defendants assert two counterclaims: (1) for expenses incurred by them when, at plaintiffs' request, defendants delayed the transshipment of the cargo from the AMERICAN TRADER to the S. S. ANNE at Benghazi; and (2) for plaintiffs' share of the general average declared in Benghazi.

The parties stipulated to the following facts which appear in Schedule "A" to the Pre-Trial Order, each party reserving the right to object as to materiality and relevance:

## "SCHEDULE 'A' STIPULATION OF FACTS

1. Defendant AMERICAN TRADING & PRODUCTION CORPORATION (hereinafter ATACORP) was the owner and operator of the S. S. AMERICAN TRADER during all times herein relevant.

2. All transverse and longitudinal bulkheads were of 'corrugated' construction with vertical web stiffeners.

3. A true copy of the said charter party is attached hereto as Exhibit 'A'.

4. Defendant tendered the vessel for loading at Smith's Bluff, Texas, on January 12, 1965.

5. On January 12, 1965, from 6:40 A.M. to 11:40 P.M. at Smith's Bluff, Texas, a part of a cargo of Grade LVI–450 (Code 69618) Lubricating Oil was loaded onto the S. S. AMERICAN TRADER. On January 13, 1965, the said vessel sailed from Smith's Bluff to Beaumont, Texas.

6. On January 16, 1965, after 1730 hours the S. S. AMERICAN TRADER sailed to Baytown, Texas, arriving there at 0844 hours, January 17, 1965, and docked at the Humble Oil & Refining Company dock at about 0845 hours.

7. Loading began at 9:15 A.M., January 17, 1965 and ended January 18, 1965 at approximately 055 hours.

8. After loading was completed at Baytown, the vessel issued certain bills

of lading, true copies of which are attached hereto as Exhibits 'B–1'.

9. The S. S. AMERICAN TRADER then sailed for the Mediterranean, and arrived at Ceuta, Morocco on, or about, February 1, 1965 at 1448 hours.

10. The vessel took on bunkers at Ceuta and sailed from Ceuta for the Suez Canal at approximately 0100 hours on February 2, 1965.

11. As the vessel entered the harbor at Ceuta, a slight oil slick was detected by the officers and/or crew, which they determined was coming from the number five port wing tank.

12. Cargo was transferred from the number five port wing tank to number eight center tank on the S. S. AMERICAN TRADER beginning at 1600 hours on February 1, 1965, and ending at 2230 hours, February 2, 1965.

13. As a result of the loss of this section of shell plating all the cargo was lost from number five port wing tank.

14. Subsequently the remainder of the cargo was sampled by Mr. P. F. Jenner of Shell International Petroleum Company Ltd., by another individual acting on behalf of Shell's affiliate in Benghazi and by E. W. Saybolt acting on behalf of the vessel's interest.

15. Subsequent to that the remaining cargo was loaded onto the M. T. ANNE, which transported it to the Nieuwe Matex N. V. tanks at Rotterdam for analysis and reconditioning.

16. The reconditioned cargo was loaded on the M. T. KAP HOORN and transported on said vessel to the port of Bombay where the following quantities were discharged in good order and condition:

| Grade | Code | Quantity (Long Tons) |
|-------|------|----------------------|
| LVI–1100 | 69616 | 152.55 |
| HVI–3650 | 64401 | 3,208.79 |
| LVI–450 | 69618 | 6,276.31 |
| MVI–N–45 | 69640 | 619.3 |
| HVI–65 | 63604 | 948.98 |
| LVI–50 | 64104 | 507.22 |
| MVI–P–1300 | 69670 | 518.87 |

17. The amount of cargo lost per grade is as follows:

| Grade and Code | TONNAGE LOST (L.T.) |
|----------------|----------------------|
| LVI–1100 69616 | 1105.62 L.T. |
| MVI–N–170 63415 | 995.55 L.T. |
| HVI–650 | 323.65 L.T. |
| LVI–450 69618 | 2,724.76 L.T. |
| MV–N–45 69640 | 10.34 L.T. |
| HVI–65 63604 | 46.77 L.T. |
| LVI–50 64103 | 9.32 L.T. |
| MVI–P–1300 69670 | .39 L.T. |

18. The above cargos were owned by Burmah-Shell Oil Storage & Distributing Co. of India, Ltd. (hereinafter Burmah Shell) at all times material to this action.

19. The normal expectable loss of such a cargo as is here involved on a voyage from the Gulf to Bombay is ½ of 1%.

20. While on board the S. S. AMERICAN TRADER, some of the cargo described in the complaint herein became contaminated by sea water and some was lost."

At trial, the following relevant facts were developed:

The AMERICAN TRADER was one of 525 T–2 tankers built during World War II. She had a length of 503 feet and a beam of 68 feet. Her construction was approved by the American Bureau of Shipping ("ABS"), the United States Coast Guard ("USCG"), and the United States Maritime Administration ("USMA"). In 1947, and again in 1952, she was strengthened by the addition of crack arresters pursuant to requirements of the ABS, which applied to all T–2's. In 1957 she was lengthened by 41 feet, in compliance with the additional strength requirements of the ABS. Throughout her life the AMERICAN TRADER was subjected to periodic surveys as required by ABS rules and USCG regulations.

On August 10, 1964 defendant ATA-CORP purchased the AMERICAN

TRADER to be used as an oil tanker. Based on ATACORP's inquiries and investigations, she was expected to have a useful life of six years, one in the "clean" trade (gasoline and kerosene) and five in the "dirty" trade (crude oil). These predictions were based on the inspections of the AMERICAN TRADER by Mr. Hicks, ATACORP's Superintending Engineer, and by Mr. Palk, its Port Engineer. In addition, ATACORP employed a professional, independent surveyor, Mr. Pillatt, to inspect the vessel and to make a written report, which he did. The reports and observations of these three disclosed that while the ship was certified in the highest class for tankers as of August 10, 1964, there were numerous renewals and repairs needed.

Following her purchase, the AMERICAN TRADER made four short voyages in the clean trade between ports on the Gulf Coast and ports on the North Atlantic Coast of the United States. In October she was drydocked at Charleston, South Carolina for major repairs based on the prepurchase reports, subsequent observations, and the tank-cleaning reports during the first four voyages. In all, 178 bulkhead leaks and 51 structural fractures were repaired at Charleston, all approved by the ABS and the USCG. The specifications called for the renewal of longitudinals, vertical web frames, and bulkhead plating in No. 5 port tank and other tanks "as will be designated." This work, however, was not done as specified at Charleston since upon inspection by the ABS, the USCG, and Palk, it was decided that renewal was not needed at that time. Instead of renewal, longitudinals in need of repair were "chipped out" and rewelded.

After leaving the drydock at Charleston, the AMERICAN TRADER embarked on six short voyages, again between Gulf ports and ports on the northeastern coast of the United States. The ship was then ordered to prepare for the voyage to Bombay to carry a cargo of lubricating oil, requiring that the cargo tanks be clean and free from rust and scale. While en route to load the cargo, the tanks were "butterworthed" twice, the first occasion yielding 6066 buckets of rust, scale, and muck, and the second immediately following it, 1300 buckets. By checkerboard ballasting, approximately 170 leaks were found, which necessitated that the AMERICAN TRADER put in for repairs. On January 7, 1965, she put in to the repair berth of Coastal Marine Services at Port Neches, Texas. The repairs, which involved replacing and renewing sections of web frames and longitudinals, required about four days and were approved by the ABS and the USCG.

The AMERICAN TRADER arrived at the Sun Oil Terminal at Smith's Bluff on January 12, 1965 to begin loading the cargo of lubricating oils for the voyage to Bombay. During the loading, a leak was discovered in No. 6 starboard tank and found to be the consequence of defective repairs by Coastal Marine. Coastal Marine was reached and instructed to repair the leak, which they did. In the meantime, the AMERICAN TRADER loaded cargo at the Mobile Oil Terminal at Beaumont, Texas and then returned to the Sun Oil Terminal at Smith's Bluff to continue loading on January 14, 1965.

During loading at the Sun Oil Terminal, several more small leaks were discovered, including one in No. 5 port tank between longitudinals 12 and 13 near frame 61. This leak was described by defendant ATACORP's port engineer, Mr. Palk, as permitting a fine stream of water to come through. The AMERICAN TRADER's Chief Mate, Mr. Perkins, described it as a "weep" like "a tear that would run down your face." This leak in the welding was repaired by stuffing it with small pieces of wood and covering over the area with a cement box.

The AMERICAN TRADER finished loading her cargo at Smith's Bluff on January 16. She then sailed to Baytown, Texas, arriving at the Humble Oil and Refining Company dock to load more cargo. When loading was completed, she sailed on January 18, 1965, arriving at Ceuta, Morocco on February 1. During

the voyage, the weather was rough, with winds of up to force 8 (39–46 mph) and wave heights of up to 26 feet.

When the vessel arrived at Ceuta to take on bunkers, an oil slick was observed by the crew coming from the No. 5 port tank. Mr. Perkins opened the tank and found the oil level about 1 foot below what it had been when loading was completed. After reporting this to the Master, the decision was made to transfer the oil out of No. 5 port tank to No. 8 center tank, which was not completed when the vessel left Ceuta. When No. 5 port tank was empty and found clear of gas, crew members entered in order to effect temporary repairs. It was found at this time that the "weep" had enlarged into a crack about 12 inches long and that a small amount of water was coming from behind the cement box. The temporary repairs consisted of hammering the crack in the weld with a ball peen hammer to stop or slow down the leak, and then welding onto the seam a patch of steel approximately 3 inches by 6 inches. When this was completed, the cargo of oil was gravitated back into No. 5 port tank from No. 8 center tank. This process was not completed due to heavy weather.

During this time, from February 4 to February 6, the ship's log recorded gale conditions, with winds up to force 9 (47–54 mph) and high to very rough seas. On February 6, a loud banging sound was heard by the crew, coming from the port side of the ship and caused by a section of the hull plating in No. 5 port tank that was ballooning in and out, or "panting." At 1810 on February 6, the vessel was diverted to Benghazi by her Master, Captain Smith, and upon her arrival on February 7 she lay at anchor outside the harbor because her draft when loaded would not permit her to enter. The ballooning became worse as the ship rolled with the seas; more cracks appeared in the hull, allowing a section of the hull to swing in and out like a barn door. Finally, on February 8 the shell plating section let loose altogether and fell into the sea. Cargo was jettisoned to lighten the vessel to a 28-foot mean draft, and on February 9 she entered the harbor with the assistance of three pilots and a tug.

While the AMERICAN TRADER was at sea after having sailed from Ceuta, there was a series of messages between ATACORP in New York and the vessel. On February 4, a message was sent to ATACORP by Captain Smith which referred to the temporary repairs then being made in No. 5 port tank; the message also indicated that Captain Smith intended to proceed to Bombay and to make permanent repairs there. Another message from the vessel was sent on February 6, after Captain Smith diverted the AMERICAN TRADER to Benghazi. Upon receipt of this message in New York, Mr. Palk was sent to Benghazi to expedite the repairs to the ship or the discharge and handling of the cargo.

When the AMERICAN TRADER arrived in Benghazi, ATACORP engaged the S. S. ANNE to transport the cargo from Benghazi to Bombay. At the request of plaintiffs, however, this transshipment was delayed for approximately ten days so that Asiatic could have samples of the cargo flown to London for testing. Subsequently, the AMERICAN TRADER's cargo was loaded aboard the S. S. ANNE and shipped to Rotterdam, where it was reconditioned. Later the cargo was shipped to its ultimate destination, Bombay, aboard the M. T. KAP HOORN.

After transferring her cargo and undergoing temporary repairs, the AMERICAN TRADER proceeded to the shipyard at Malta. She was surveyed by Mr. Palk (for ATACORP), by Mr. Nisbet (for the hull underwriters), and by Mr. Hansen (for the ABS). Mr. Hansen reported that a substantial number of internal members needed immediate replacement if the vessel was to remain in class. Mr. Palk reluctantly agreed. Mr. Nisbet also found numerous fractures and wasted internal members, and in his opinion these defects had existed prior to the commencement of the voyage and had contributed to the loss of the shell plat-

ing section and, thus, to the loss of some of the cargo.

It is agreed by the parties that the shipment was subject to the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1300 et seq. Plaintiffs contend that the AMERICAN TRADER was unseaworthy at the time she broke ground at Smith's Bluff on January 18, 1965. Defendants deny that the AMERICAN TRADER was unseaworthy when she broke ground and contend that ATACORP exercised due diligence to make her seaworthy, and that the loss was occasioned by a latent defect in the plates at No. 5 port tank which due diligence could not have disclosed.

█ It is undisputed that the cargo was delivered to the vessel in good order and condition and that during carriage some was lost and some was contaminated. Therefore, under COGSA, defendants have the burden of proving that they exercised due diligence to make the AMERICAN TRADER seaworthy. M. W. Zack Metal Co. v. S. S. Birmingham City, 311 F.2d 334, 337 (2d Cir. 1962), cert. denied, 375 U.S. 816, 84 S.Ct. 50, 11 L.Ed.2d 51 (1963). See Margarine Verkaufsunion G.m.B.H. v. M.T. G.C. Brovig, 318 F.Supp. 977 (S.D.N.Y.1970) and cases cited therein at 980 n. 13. The defendants have not sustained this burden.

The numerous repairs made during and just prior to loading indicate the generally deteriorated condition of the AMERICAN TRADER. The hull experts who inspected her before the drydocking at Charleston advised that many internal members would have to be renewed "in the near future." Of the repairs specified to be done at Charleston, some were not performed because it was thought that at the time they were not needed. Thereafter, however, numerous leaks were discovered in the shell plating and bulkheads; fractures and cracks were observed in the internal structural members; and at least seven of the longitudinals in No. 6 starboard tank were observed by Palk to be bent and deflected inward. He testified that the

renewal of the web frames and longitudinals in that area was a "good sized job." In Ceuta, both Perkins and the Master observed fractures and wastage. Finally, at Benghazi, pictures taken of the ship exhibited a "starved horse" effect, indicating that the hull may not have been "so tight, staunch, and strong," as to complete safely the voyage undertaken. See E. I. Dupont de Nemours & Co. v. Vance, 60 U.S. (19 How.) 162, 167, 15 L.Ed. 584 (1856).

With respect to the repair of the leak in No. 5 port tank, the evidence discloses that the repair was proper, if at all, only as a temporary measure until the vessel could reach a shipyard. Constructing cement boxes over leaks in welds is not approved by the ABS nor by the USCG. The usual requirement is that the defective weld should be chipped out and rewelded, which was not done in this case. Here, however, the vessel attempted to make a transatlantic voyage in midwinter without first effecting a permanent repair to the damaged No. 5 port tank.

The numerous leaks and structural fractures requiring repairs distinguish this case from those cited by defendants, where latent defects were triggered into actual failure without prior warning. In Peter Paul, Inc. v. The M.S. Christer Salen, 152 F.Supp. 410 (S.D.N.Y.1957), aff'd sub nom., Peter Paul, Inc. v. Rederi A/B Pulp, 258 F.2d 901 (2d Cir. 1958), the vessel broke in two while on a voyage from Yokohama, Japan to Vancouver, B. C. The mishap was caused by a brittle fracture in the hull, which could have been prevented by the installation of crack arresters. The Court of Appeals affirmed a finding of the district court that the accident happened suddenly, without warning, and for no apparent reason. Concluding that it was unforeseeable that the hull was "notch brittle" because the ship had been on the seas for years without displaying the slightest indication of her latent unseaworthiness, the Court of Appeals held that the shipowner was not required in

the exercise of due diligence to have installed crack arresters.

In Margarine Verkaufsunion G.m.B.H. v. M.T. G.C. Brovig, 318 F.Supp. 977 (S.D.N.Y.1970), an action by a consignee to recover damages for short delivery and contamination of a shipment of cottonseed oil, the district court found that the cause of the shortage and the contamination was a crack in the plate in the No. 5 port wing tank. The court concluded upon the evidence, however, that the latent defect in the plating could not have been discovered by due diligence before the event. The court noted that that case was significantly different from cases where there was pitting, corrosion and general deterioration of the cracked plates near the point of fracture. 318 F.Supp. at 982–983. The vessel there was inspected and approved by a Lloyd's surveyor nine months before the voyage in suit. Thereafter, the captain personally inspected the tanks and saw no leaks, observing that the tanks were completely watertight. In addition, independent surveyors inspected the tanks and found them to be clean, dry, and suitable to receive the shipment of cottonseed oil.

In Balfour, Guthrie & Co. v. American-West African Line, Inc., 136 F.2d 320 (2d Cir. 1943), a suit for cargo damage, the court found that a hull plate on the vessel cracked during heavy seas, water entered the hold, and the cargo was thereby damaged. The Court of Appeals affirmed a finding that the shipowner had exercised due diligence in making the vessel seaworthy. Just prior to the voyage in suit, two regular surveys were made. In addition, numerous visual examinations were made, which disclosed no flaws with the exception of some corrosion on the plate adjacent to the one which cracked.

In the present case, in contrast to those above, there was ample evidence of small leaks and structural fractures throughout the hull of the AMERICAN TRADER. In addition, numerous repairs were required and made just prior to the vessel's departure for Bombay, indicating the general deterioration of the vessel. Thus, the present case is similar on its facts to General Motors Corp. v. The Olancho, 115 F.Supp. 107 (S.D.N.Y. 1953), aff'd, 220 F.2d 278 (2d Cir. 1955). There, the district court found, and the Court of Appeals agreed, that defendant shipowners did not exercise due diligence in that the vessel was corroded and deteriorating at the commencement of the voyage.

Against the background of the general deterioration of the AMERICAN TRADER, there was evidence that the cement box repair in No. 5 port tank, which was not approved by the ABS nor the USCG, was the cause of the eventual loss of the shell plating section. Defendants assert that the crack that led to the loss of the hull panel began as a vertical crack at frame 59 and that this crack turned and propagated forward until it reached frame 62, allowing the section to swing back and forth as if it were on hinges. Plaintiffs contend that this explanation is unsatisfactory and that the defective cement box repair caused the mishap. The court finds this explanation more credible. The weep near frame 61 and longitudinals 12 and 13 was found at Ceuta to have lengthened into a 12-inch crack. Thereafter, it could not be seen since the tank was partially filled with water and oil. Mr. Silkiss, a metallurgist who testified for defendants, concluded that the chevrons in the steel remaining on the ship when the section was lost indicated that the crack at the top of the section later lost propagated aft, toward frame 59, not forward. Mr. Nisbet, a hull surveyor who also testified at trial by deposition, concluded that the point of origin of the failure was the defect behind the cement box. Finally, there was circumstantial evidence of wastage and serious damage to the internal structure of No. 5 port tank; and with little internal support in No. 5 port tank, it is reasonable to infer that a crack in the hull plating might propagate. Defendants' explanation of the failure is not sufficient to prove otherwise.

■ This court finds that the AMERICAN TRADER was unseaworthy at the time she broke ground at Smith's Bluff, and that the unseaworthiness caused the loss and damage to the cargo. The court further finds, on the evidence, that the defendants failed to use due diligence to make the vessel seaworthy, and that this was particularly true with respect to the makeshift repairs in the No. 5 port tank which were made at Smith's Bluff. At best, these repairs were adequate only until the vessel could reach a shipyard. They were totally inadequate for a voyage across the Atlantic in winter. The evidence discloses that the weather encountered in the Atlantic and in the Mediterranean was not unexpected for a midwinter voyage such as the one here involved.

## COUNTERCLAIMS

### (1) The Delay in Transshipment

■ The delay in the transshipment of the cargo from the AMERICAN TRADER to the S. S. ANNE was requested to enable plaintiffs to send samples of the cargo to London for inspection. As a result of this inspection, the evidence indicates that instead of going to Bombay for delivery as originally contemplated, the S. S. ANNE took the cargo to Rotterdam for decontamination. Under the circumstances, this was a reasonable request on the part of the plaintiffs and, since it was the fault of the defendants which required the transshipment in the first instance, the court finds that defendants are not entitled to recover their expenses by reason of the delay, and the first counterclaim will be dismissed.

### (2) General Average

The charter party contained the New Jason Clause reading as follows:

"NEW JASON CLAUSE: In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods."

■ Since the court finds that defendants are responsible under COGSA for the damage to the cargo, plaintiffs are not required to contribute to the general average under the New Jason Clause. Societa Anonima Cantiero Olivo v. Federal Insurance Co., 62 F.2d 769 (2d Cir. 1933).

For the foregoing reasons, an interlocutory judgment may be entered in favor of the plaintiffs on the main cause of action and dismissing both of defendants' counterclaims. The matter of damages will be reserved for a further hearing to be noticed by the parties.

Settle interlocutory judgment on notice.