MEGARRY BROTHERS, INC., a Corporation and St. Paul Fire and Marine Insurance Co., a Corporation, Appellants,

v.

UNITED STATES of America, for the Use of MIDWESTERN ELECTRIC CONSTRUCTION, INC., a North Dakota Corporation, Appellee.

No. 19126.

United States Court of Appeals Eighth Circuit.

Dec. 10, 1968.

Richard H. McGee, of McGee, Van Sickle, Hankla, Backes & Wheeler, Minot, N. D., for appellant.

Arthur W. Stokes, of Stokes, Vaaler, Gillig, Warcup & Woutat, Grand Forks, N. D., for appellants.

Before MATTHES, GIBSON and BRIGHT, Circuit Judges.

FLOYD R. GIBSON, Circuit Judge.

The defendants Megarry Brothers, Inc., and St. Paul Fire and Marine Insurance Co., surety of Megarry Brothers, appeal from a judgment of $29,400 entered in the United States District Court for the District of North Dakota on a jury verdict finding an oral contract existed between Megarry Brothers and the use plaintiff, Midwestern Electric Construction, Inc., for the installation of insulation covering sump drainlines at the United States missile site at Minot, North Dakota.[1]

Megarry Brothers was the prime contractor with the United States for the construction of Drainage Improvement I on 90 missile sites at Minot AFB, North Dakota. Megarry Brothers' bid was in the original amount of $746,439.61, plus an additional amount for fence replacement. As a part of the contract bid the existing sump drainlines were to be modified by wrapping them with electrical heat tape where the lines were exposed or were above the frost line. These lines were about 25 feet in length and originally consisted of three-inch diameter cast iron pipes and were so located to drain each of the concrete missile site enclosures; also included were certain pumping station facilities. Megarry Brothers subcontracted to Midwestern by written agreement the pumping station facilities and the "modification—existing sump drainline" with the notation that the latter item referred to "electrical items in their entirety," all for a stated consideration of $120,000. There is no dispute about the pumping station facilities, nor the installation of the electrical heat tape together with the electrical connections to make the heat tape operative. The heat tape is made up in one unit like copper tubing and is round and about one-fourth inch in diameter. This tape is wrapped around the drainpipe, using about three feet of tape for every foot of drainpipe. Blocks of insulation two inches in thickness are placed over the heating tape, which insulation has been precast to conform with the configuration of the pipe, and is fitted to the pipe in two halves wired together and then wrapped with scotch-rap, except where it is exposed to the weather where galvanized sheeting is used for protection to the drainpipe line.

The dispute arises over the installation of the insulation and the covering for the insulation. Midwestern contends that it had an oral contract with Megarry Brothers to install the insulation and the

1. This is a Miller Act case in which the United States of America is the nominal plaintiff for the use of Midwestern Electric Construction, Inc. The St. Paul Fire and Marine Insurance Co. is joined as defendant in its capacity as surety of Megarry Brothers for the Miller Act bond covering labor and materials. The parties will be referred to by abbreviated designations—"Megarry Brothers" and "Midwestern."

scotchrap, and evidently the galvanized sheet metal where necessary, for $29,400, broken down into a per unit cost of $350 for each of the 84 missile sites that were modified under the contract. Megarry Brothers contends that the insulation and wrapping was an integral part of the "electrical items" included in the written subcontract.

Initially, Ronald Megarry as president of Megarry Brothers, when compiling its competitive bid on the project, asked John Schroeder, president of Midwestern, for a bid on the electrical portion of the project. Midwestern reviewed the plans and specifications and gave an oral bid of $100,000 to Megarry Brothers by telephone on June 25, 1965, the day of the bid letting in Omaha, Nebraska. Megarry Brothers was the successful bidder.

On July 2, 1965, a conference was held in St. Cloud, Minnesota, between Megarry, Schroeder and Robert Peterson, vice-president of Midwestern. After some preliminary discussion and negotiation, a letter of intent was entered into between Midwestern and Megarry Brothers. The purpose of the letter of intent was to sublet to Midwestern "the electrical items in their entirety and the pump package units for the pumping station facility" involved in the drainage improvement project, in order that bonding could be obtained prior to formulating an official subcontract agreement. The letter of intent provided "the lump sum payment for completely constructing and acceptance of the above referenced work including all labor, materials, bonds and taxes are hereby included in the lump sum figure of $120,000.00." Following execution of the letter of intent, Midwestern ordered electrical items for the job from July 6–July 13.

On July 7, 1965, a pre-construction conference was held in the office of the Corps of Engineers at the Minot AFB. Following the conference, Peterson suggested to Megarry a modification of the prime contract by use of a substitute method of insulation and covering. Instead of the 16-gauge galvanized steel jacket originally specified in the con-tract, Peterson proposed using scotchrap protective tape for application over the insulation. Megarry told Peterson to proceed, and Peterson prepared shop drawings covering the proposed modification; the shop drawings were transmitted to the Corps of Engineers on July 16, 1965, and were approved on July 20. The modification reduced Megarry Brothers' contract with the United States by $3,466.20; Megarry Brothers did not charge this amount against its contract with Midwestern.

On July 19, 1965, Midwestern signed a standard form subcontract which had been prepared by Megarry Brothers on July 9 and had been forwarded to Midwestern by letter on July 17, 1965. The subcontract let to Midwestern under specification sections 3 and 4 of the prime contract the "electrical items in their entirety" and the pump package units for the lump sum of $120,000.

On July 21, 1965, Midwestern ordered the insulation and tape as shown on the shop drawings, and on July 26 commenced work on the project. Midwestern did only electrical work as the insulation, which was shipped from California, did not arrive until sometime in August.

Midwestern used two crews consisting of three electricians each. Each crew worked eight to ten hours per day and completed one site per day. Work done on each site included installing heat tape and insulation, wrapping the pipe with protective tape, installing the probe, relays, circuit breakers and core drilling through an 18½ inch concrete wall into the support building. Also, a metal covering over the exposed end of the pipe was installed. Due to a lack of asbestos workers in the area, all of the insulation work was done by Midwestern's electricians.

On July 28, 1965, Midwestern assigned all accounts receivable from Megarry Brothers under the subcontract to Arthur W. Stokes. The assignment stated the amount of the account under the subcontract to be $120,000.

As the work on the project progressed during August and September, Megarry Brothers forwarded to Midwestern payments based on the Corps of Engineers' estimates for work completed. Based on these estimates Megarry Brothers made seven payments to Midwestern between August 16, 1965 and January 21, 1966, in total amount of $123,310 (an addition of $3,310 for internal conduit and wire seal was made to the lump sum of $120,000). A 5 per cent retainage of $6,165.50, which was the first cause of action in Midwestern's claim against Megarry Brothers in this case, was paid by Megarry Brothers just prior to trial and is not now at issue. The August 16 statement shows that Megarry Brothers paid Midwestern at the rate of $997 for a completed site, a rate of payment that was continued through the seven periodic payments.

On August 6, 1965, an invoice dated July 31, 1965, was forwarded by Midwestern to Megarry Brothers showing the amount earned through July 31. Midwestern claimed compensation for sites completed at the rate of $997 per site; this was before any insulation had been installed. An undated invoice was forwarded by Midwestern to Megarry Brothers around the last of August or the first of September showing as earned to date, 49 sites at $1340, totaling $65,660. On September 30, 1965, Midwestern forwarded to Megarry Brothers an invoice showing its total claim for its work on the sites which was now complete: contract—$120,000, insulation—$29,400.

On October 31, 1965, John Schroeder, president of Midwestern and long-time friend of Ronald Megarry, died. Sometime in June 1966, Mrs. John Schroeder and Ronald Megarry met at the Grand Forks, North Dakota Airport in an effort to settle the subject matter of this litigation. At that time, Mrs. Schroeder said Megarry agreed to pay for the insulation and tape, but not for the cost of labor to install it. The effort at compromise was unsuccessful.

Midwestern's position is that sometime between July 20–22, 1965, Ronald Megarry and John Schroeder orally agreed to a new and different contract subsequent to the written contract between the parties, the second contract covering insulation which was not included within the first contract covering electrical items and the pump package units. Megarry Brothers contends that (1) the evidence adduced at the trial fails to show that an oral contract existed, but does show that the insulation was an integral part of the electrical items included in the written contract. In addition, Megarry Brothers asserts error in (2) testimony by Mrs. Schroeder regarding the attempt at compromise by Ronald Megarry; (3) testimony by Robert Peterson of a conclusional nature regarding the written contract; (4) cross-examination of Ronald Megarry concerning a portion of the litigation which had been settled; (5) the trial court instructing the jury on correspondence between the parties with reference to the alleged oral contract; (6) the trial court refusing to instruct the jury on alteration or modification of the terms of a written contract; and (7) the trial court failing to allow the jury to find the amount of damages, if any, on a quantum meruit theory.

■ Megarry Brothers' first contention states, in essence, that as a matter of law the evidence was insufficient to submit the question of the existence of an oral contract covering insulation to the jury, and the evidence conclusively showed that the insulation was included within the term "electrical items in their entirety" found in the written contract. We disagree. The above clause is ambiguous. Under the facts herein presented the trial court properly submitted the issue to the jury.

■ As noted in 17A C.J.S. Contracts § 611, p. 1230 (1963):

" * * * it is the duty of the court to determine and inform the jury whether a paper or writing introduced in evidence as a building and construction contract is or is not a contract. On the other hand, where the question is as to the existence, not the validity or construction, of a building and con-

struction contract, and the evidence is conflicting, the question is one for the determination of the jury."

See, Gibson & Odom Electric Company v. R. F. Ball Construction Company, 368 F.2d 182, 183 (5 Cir. 1966); Kingsbury Breweries Company v. Schechter, 142 F. Supp. 219, 222–223 (D.C.Minn.1956).

While Megarry Brothers argues that there is no evidence showing an oral contract, Midwestern's lack of direct evidence is laid to the untimely death of Robert Schroeder. There is circumstantial evidence that the jury could consider as indicating the existence of an oral contract covering the insulation. Robert Peterson, who prepared Midwestern's bid, testified that the written contract providing for "electrical items in their entirety" did not include insulation. He said electrical work included all the electrical working, including heat tape wrapped around the pipe after the pipe was installed by another trade. At the July 2 meeting with Megarry in St. Cloud, he worked up at Megarry's request a proposal which included all the work within the fenced area including digging up the pipes, relocating them and doing the electrical plus the mechanical work. For this bid it was necessary to secure bids from other subcontractors, which he did. Megarry rejected the proposal, stating that the mechanical and general contracting items were excessive. The narrative statement in the record reads: "Megarry said the item for sheet metal was a very excessive amount of money and we knew it was an exorbitant price, but it was what was quoted to us." This would be some indication that at least the outer covering for the pipe was not included in the contract bid. After a rejection of this more comprehensive proposal, Midwestern and Megarry came to an agreement on the electrical work. In addition to the electrical work on the drainline pipe, the written contract called for the furnishing and installation of 6 pump station sites on which Peterson had received a firm quotation of $27,960, which was included in the lump sum bid of $120,000 explaining the difference between the $100,000 initial estimate and the $120,000 contract price. Megarry testified that he received no other electrical contractor's bid, and he did not receive any estimate for insulation from any other contractor, and "We estimated the plumbing and 16-gauge sheet metal ourselves." This also indicates that the sheet metal covering for the installation was not included in the electrical contract.

Further, Peterson began ordering the electrical items immediately after the signing of the letter of intent and just before the conference at which the insulation modification was discussed; insulation was not ordered until July 21, shortly after the Corps of Engineers approved the modification. The adjustment of $3,466.20 in Megarry Brothers' contract following approval of the modification was not charged against Midwestern's written contract with Megarry Brothers, as would have happened if insulation had been provided for in the written agreement. As early as the last of August, about a month before Midwestern completed its work on the project, Megarry Brothers was apprised that Midwestern considered the insulation cost as additional to the agreed cost per site; yet, Megarry Brothers did not voice objection nor communicate with Midwestern concerning the matter.

There is, however, evidence in support of Megarry Brothers' position. Ronald Megarry testified that insulation was included in the written contract. It seems unlikely that parties that went to the trouble of drafting a letter of intent and signed a contract of $120,000 for labor and materials would not draft a written instrument covering $29,400 of insulation and installation, or at least modify the original written contract to include same. Insulation around the heat tape, which is wrapped to the pipes, is essential if the heat tape is to perform its function. The insulation would seem to be an integral part of work on the electrical phase of the project. Irving L. Besemann, president of Holmes Electric Company, Inc., that bid on the electrical work

for another contractor bidding this job, testified that his company does insulation if specifications call for electrical heating. In his opinion, the specifications on this project indicated that insulation was included, and his company bid the job in that manner. The record is silent on the amount of the Holmes Electric Company bid, which included the cost of insulation provided by a sub-bid from Minot Plumbing and Heating Company. We cannot, of course, make a proper comparison of the Holmes Electric bid with the contract in question unless we knew whether they were both bidding on the same specific items. A comparison of the amount of the Holmes bid with the contract amount of Midwestern's bid might provide the answer to this unfortunate hassle. If the Holmes bid were sufficiently greater to cover the insulation item it would be a probative indication that Midwestern's bid did not, and conversely if it were of approximately the same amount it would buttress Megarry's contention that the insulation was included in the Midwestern contract. On the other hand we recognize the Holmes bid could prove inconclusive and might be subject to other explanations.

The lack of asbestos workers in the area to install insulation would be known to those in the construction trades and an electrical contractor bidding a job would probably know that responsibility for the installation of insulation was his. Glen Griffin, an electrician employed by Midwestern and foreman on one of the crews doing the modification work, testified that he told the plumbers the electricians were going to do the insulation work and they were entitled to do it "because in reality the work did not belong to electricians or the plumbers." He also explained to Mr. Ove of the Corps of Engineers that he was being paid more than the basic hourly rate for electricians in order to compensate him for the added or higher hourly rate that the insulators were usually paid.

■ While we feel there should be more supporting evidence, including some type of written memoranda evidencing a definite oral agreement as to subject matter and price on the insulation segment of the part of the project undertaken by Midwestern, we appreciate the handicap of Mr. Schroeder's demise, and we are also inclined to give considerable weight to the finding of the jury and the experienced trial judge in passing upon credibility issues. The evidence when viewed as a whole is conflicting and subject to inferences favoring each side. When this situation occurs the issue of the existence of an alleged oral contract is properly submitted to the jury.

Megarry Brothers' second claim of error concerns testimony regarding settlement negotiations. Mrs. John Schroeder was allowed to testify over objection that she and Ronald Megarry met at the Grand Forks Airport in an effort to amicably settle the difficulty between Midwestern and Megarry Brothers in closing out their contract and Ronald Megarry said that he owed Midwestern for the insulation and the tape, but there was some discrepancy about the amount.

■ Both parties rely on Larson v. Quanrud, Brink & Reibold, 78 N.D. 70, 47 N.W.2d 743, 29 A.L.R.2d 230 (1950) which recognizes the general rule at 748:

"This court is in accord with the general rule that unaccepted offers of compromise are not admissible in evidence as admissions, but that admissions with respect to independent facts which are made during the course of compromise negotiations may be received in evidence."

Midwestern argues that Ronald Megarry admitted an independent fact—his company owed Midwestern for the tape and insulation. Megarry Brothers contends that Larson supports its view that the questioning of Mrs. Schroeder was improper and prejudicial. In Larson, an initial conversation between plaintiff and defendant's agent was admissible since neither the circumstances nor the testimony indicated that a controversy then existed or that the defendant's agent was attempting to settle plaintiff's claim against the defendant. However, a sec-

ond conversation was of a different character as the court noted at 749 of 47 N.W. 2d:

> "As to the meeting in Mr. Larson's office, the negotiations there entered into the realm of dispute and any proposal made by Mr. Brink in the nature of an offer of settlement was inadmissible under the rule * * * and should have been excluded * * *."

The exception to the rule admitting "independent facts" as an admission against interest does not lend itself to clear-cut applications, see 15 A.L.R.3rd 13, 22–33 (1967), and has been criticized as a misleading and inadequate expression of one aspect of the rule in IV Wigmore, Evidence § 1062 (3rd ed. 1940). In Wigmore, supra, § 1061 the reason for the rule and the primary consideration in its application are stated:

> "The true reason for excluding an offer of compromise is that it *does not* ordinarily proceed from and *imply a specific belief that the adversary's claim is well founded,* but rather a belief that the further prosecution of that claim, whether well founded or not, would in any event cause such annoyance as is preferably avoided by the payment of the sum offered.
>
> \*    \*    \*    \*    \*
>
> "What is important is the *form* of the statement, whether it is *explicit* and *absolute.* If, making all implications from the context and the circumstances, the statement assumes the adversary's claim to be well-grounded for the mere purpose of discussing a settlement which will avoid litigation, and expresses nothing as to the terms of the specific claim, it is not an admission; nor is the party making it in any the worse condition for having omitted the phrase 'without prejudice' or for having offered the full amount of the claim without any pretence of compromise."

■ Admittedly, the question is close in this case, but we believe that it was prejudicial error to admit Mrs. Schroeder's testimony. Ronald Megarry's state-

ments to Mrs. Schroeder, as indicated by their meeting at the airport for the express purpose of reaching a settlement, formed an inseparable part of efforts to compromise a dispute which had been ripening for some eight months. Further, Megarry's agreeing to pay for the insulation and tape, valued at $3,903.40 by Midwestern's figures, in settlement of a $29,400 claim would seem to be a clear attempt at compromise. Also, the alleged admission is ambiguous as it refers to insulation and tape, which latter item he could owe, as at that time he was withholding some $6,165.50 due Midwestern on the written contract. In this case competent evidence supporting Midwestern's claim of an oral contract is far from convincing and the admission of Mrs. Schroeder's testimony concerning an equivocal statement made during settlement negotiations could well have influenced the jury to find for Midwestern and thus was prejudicial error. Testimony concerning the conversation at the airport regarding the settlement attempt should be excluded at a retrial.

Megarry Brothers next asserts that the trial court erred in admitting over objection the testimony of Robert Peterson that "electrical items in their entirety" as contained in the written contract did not include insulation. Megarry Brothers argues that Peterson was an interested party, being the one who prepared Midwestern's bid on the project, and his testimony was a self-serving declaration that was inadmissible. The contention is not well taken.

■ The trial court having determined that the phrase "electrical items in their entirety" was ambiguous, it was proper for Peterson, qualified as an expert witness in the field of electrical engineering, to express his opinion that in any electrical contract such a phrase would not include insulation. Further, Peterson, as one present at the negotiations and the formation of the letter of intent and the contract, was qualified to testify as to the meaning of the phrase. Extrinsic evidence was admissible for the purpose of clarifying the uncertain

term. Harrison Sheet Steel Co. v. C. H. Morgan, 268 F.2d 538, 542–543 (8 Cir. 1959); United States v. Northern Pac. Ry. Co., 188 F.2d 277, 280 (8 Cir. 1951); 32A C.J.S. Evidence § 962, p. 436 (1964). The fact that Robert Peterson was an employee of Midwestern when the estimate and written documents were drawn does not disqualify his testimony, but would merely be a factor to be taken into consideration by the jury in weighing the credibility of his testimony. If such were not correct, the testimony of Ronald Megarry as to the meaning of the term would have been improper as subject to the objection urged. We are not here considering an unambiguous integrated contract but a definitely ambiguous contract drawn by Megarry Brothers, whose responsibility it was to set forth with specificity the items covered in the contract. This it did not do; there being no enumeration of the operations covered, only the general phrase "electrical items in their entirety." This broad, vague and ambiguous phraseology will be construed most strongly against the party drawing the agreement. Harrison Sheet Steel Co. v. C. H. Morgan, supra.

Megarry Brothers next asserts that the trial court erred in denying a motion for mistrial when Midwestern, on cross-examination of Ronald Megarry, inquired into the payment of retainages to Midwestern. The withholding of funds retained by Megarry Brothers was the subject of the first cause of action alleged in the original complaint. The issue was settled the day before this case came to trial with Megarry Brothers paying Midwestern the $6,165.50 retainage. Midwestern's counsel was attempting to attack the credibility of Ronald Megarry by showing that Megarry Brothers did not make payments to Midwestern in accordance with Corps of Engineers' estimates as Ronald Megarry had testified. In the questioning of Ronald Megarry concerning an accounting sent to Midwestern that accompanied a check for work completed, the following colloquy ensued:

"Q. Yes, and still showing you here Plaintiff's Exhibit 8, which is your letter dated January 21st, 1966, there is a retention of $6,165.50?

"A. It is a five per cent retainage, yes.

"Q. And this retention of $6,165.50 was not paid by you until yesterday in conference?"

Counsel for Megarry Brothers then objected and moved for a mistrial. The trial judge commented, "I am afraid we are one jump ahead of a mistrial", sustained the objection, but denied the motion and cautioned the jury to pay no attention to the question regarding the first cause of action. The experienced trial judge correctly ruled the question improper as serving no legitimate purpose. We need not decide whether the cautionary remarks made to the jury were sufficient to cure the prejudice to Megarry Brothers as this case is remanded. At a retrial references to the settled cause of action should be carefully avoided.

Megarry Brothers asserts the trial court erred in instructing the jury on correspondence with reference to the alleged oral contract.[2] It contends that failure to reply to Midwestern's unsigned invoices is nowise evidence of the truth contained therein since payments by Megarry Brothers to Midwestern were based on Corps of Engineers' estimates, not the invoices, and the invoices do not represent part of a continuing line of correspondence between the parties. The record shows two invoices were sent— one around the last of August or the first

2. The trial court's instruction reads in relevant part:

"Where two persons or corporations have carried on correspondence in reference to a particular subject and one of the parties has written a letter to the other making statements concerning the subject matter of the correspondence which the person receiving the letter would naturally deny if not true, the latter's failure to answer the letter is evidence which tends to show that the statements in the letter are true."

of September, the other dated September 30, 1965—which would apprise Megarry Brothers that Midwestern deemed the insulation not covered under the terms of the written contract.

■ A good summation of the general rule and factors to be considered in its application is found in McCormick, Evidence § 247, pp. 531–532 (1954):

"* * * [F]ailure to reply to a letter, containing statements which it would be natural under all the circumstances for the addressee to deny if he believed them untrue, is receivable as evidence of an admission by silence. Two factors particularly tend to show that a denial would be naturally forthcoming, first, where the letter was written as part of a mutual correspondence between the parties, and second, where the proof shows that the parties were engaged together in some business or other relationship or transaction which would make it improbable that an untrue communication from one to the other about the transaction or relationship would be ignored. The most common instance of this latter situation is the transmission by one party to such a business relationship to the other of a statement of account or bill rendered. A failure to question such a bill or statement is uniformly received as evidence of an admission of its correctness."

Megarry Brothers points to the annotation at 8 A.L.R. 1163 (1920) for support. Among the cases collected is Peninsular Naval Stores Co. v. Parrish, 13 Ga.App. 779, 80 S.E. 28 (1913), where the parties disagreed as to construction of the contract between them. An unanswered letter from defendant to plaintiff, stating defendant's position, was held admissible since it was apparent to plaintiff that the defendant was placing a different construction on the agreement than plaintiff, and plaintiff would be expected to object. An examination of cases in the above annotation and elsewhere [3] verifies the statement in IV Wigmore, Evidence § 1073, p. 93 (3rd ed. 1940) that "* * * the precedents indicate that each case must stand on its own facts."

■ In this case, however, we believe that the trial court was clearly correct in admitting the invoices sent from Midwestern to Megarry Brothers, and in instructing the jury as to the evidentiary significance of Megarry Brothers' failure to reply to same. The parties were in the course of a business transaction involving a substantial amount of money. The statements sent by Megarry Brothers, which accompanied payment to Midwestern for work completed based on Corps of Engineers' estimates, coupled with the invoices sent by Midwestern, although not responsive one to the other, constitute continuing correspondence concerning the amount due Midwestern

3. See for example, Leach & Company, Inc. v. Peirson, 275 U.S. 120, 48 S.Ct. 57, 72 L.Ed. 194, 55 A.L.R. 457 (1927) where plaintiff wrote to defendant of a promise made by defendant's agent to repurchase bonds at certain price and the letter, which was unanswered by defendant, was offered as evidence of the promise and the agent's authority to make it. Mr. Justice Holmes held at 128 of 275 U.S. at 57 of 48 S.Ct.:

"A man cannot make evidence for himself by writing a letter containing the statements that he wishes to prove. He does not make the letter evidence by sending it to the party against whom he wishes to prove the facts. * * * Therefore, a failure to answer such adverse assertions in the absence

of further circumstances making an answer requisite or natural has no effect as an admission."

The decision is criticized in IV Wigmore, Evidence § 1073, p. 94, n. 3 (3rd ed. 1940) as "* * * a decidedly erroneous ruling, both on principle and on the particular facts * * *"; and in McCormick, supra, p. 532, n. 28. Compare Helburn v. Spiewak, 180 F.2d 480, 482 (2 Cir. 1950) where an unanswered letter stating the terms of a previous oral transaction between the parties was held admissible, and Leach, supra, was harmonized with the holding as "further circumstances" indicated that if acquiescence was intended it was "natural" that no reply be made.

for work on the project. Megarry Brothers, upon receipt of the two invoices indicating Midwestern's position with regard to what was owing for site work including insulation, would be expected to make some objection, written or oral, disputing Midwestern's claim. Under the circumstances, Megarry Brothers' silence was evidence tending to show that it did not dispute Midwestern's statement of what was owed, and the trial court correctly instructed the jury to that effect.

Megarry Brothers argues that the trial court erred in refusing to instruct the jury on alteration or modification of the terms of a written contract. Midwestern contends that such instructions offered by Megarry Brothers were properly refused by the trial court as not applicable to the facts in this case as Midwestern's claim was predicated on the existence of a separate oral contract and not on a modification of the written contract between the parties.

■ While the refused instructions are not applicable to the evidence adduced in support of Midwestern's theory of recovery, we believe the trial court should instruct the jury as to Megarry Brothers' theory of the case that finds support in the evidence—the written contract included insulation and could not be altered without the mutual assent of the parties to the contract. A party is entitled to have proper requested instructions on his theory of the case if there is evidence to support it. Heerman v. Burke, 266 F.2d 935, 938, 73 A.L.R.2d 1206 (8 Cir. 1959); Mathes and Devitt, Federal Jury Practice and Instructions, § 5.02, p. 53 (1965). We do not comment specifically on the refused instructions [4] offered by Megarry Brothers as this case is remanded for a new trial and we would not attempt, nor would it be proper, to approve or formulate instructions at this stage of the proceedings. At a retrial, the trial

court can insure, after the evidence has been presented and proper instructions requested, that Megarry Brothers' theory of the case is presented to the jury.

■ Megarry Brothers' final contention is that the trial court erred in the verdict form submitted to the jury by refusing to allow the jury to find the amount of Midwestern's recovery, if any, on a quantum meruit theory. The trial court submitted two general forms of verdict—one providing for dismissal of Midwestern's action, the other providing for recovery by Midwestern of $29,400— over objection by Megarry Brothers that the jury should not be confined to finding the sum stated, but should be allowed to find for Midwestern in the amount of blank dollars or in such sum as Midwestern was entitled to, or on a quantum meruit theory for services and material rendered. The trial court ruled, "It is all or nothing."

We hold the trial court erred in this respect. We believe there were three possible verdicts the jury could have reached under the facts of this case. In addition to the two submitted to the jury, the jury could have found insulation was not included in the written contract, as contended by Midwestern, and Midwestern was entitled to recover a reasonable amount for labor and materials on the basis that there was an oral agreement but proof of the amount agreed upon was insufficient to warrant recovery of the full $29,400 claimed, or that there was no oral agreement but Megarry Brothers knowingly assented to Midwestern's installing the insulation.

There is evidence in the record that the actual cost of the insulation was $3,903.-40, and evidence from which the cost of labor for installation could be computed, putting the reasonable value of insulation and labor at approximately $7,450. Midwestern's evidence of an oral contract

---

4. The full charge of the trial court is not included in the record certified to us on appeal. It is not possible to consider an alleged error in refusal to give specific instructions without considering the entire charge given. "It is, of course, axiomatic that the instructions must be considered as a whole." General Insurance Company of America v. Hercules Construction Company, 385 F.2d 13, 24 (8 Cir. 1967).

in the amount of $29,400 was not overwhelming, and its case hangs rather tenuously on the two invoices stating a charge for the insulation. Ordinarily more evidence would be forthcoming in a transaction of this type. However, on a retrial we do not foreclose the possibility that Midwestern may be able to again convince a jury for the full amount claimed, although the evidence is sketchy on the record before us.

Reversed and remanded for proceedings consistent with this opinion.