MARGARINE VERKAUFSUNION
G.m.B.H., Plaintiff,

v.

M.T. G.C. BROVIG, her engines, boilers, etc., Partrederiet Brovigtank, Th. Brovig, and General Navigation, Inc., Defendants.

No. 65 AD. 3.

United States District Court,
S. D. New York.

Sept. 29, 1970.

Donovan, Donovan, Maloof & Walsh, New York City, for plaintiff; James M. Kenny, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for Partrederiet Brovigtank and Th. Brovig; Edward L. Smith, David W. Martowski, New York City, of counsel.

Katz, Wittenberg & Katz, Garrity, Connolly, Lewis & Grimes, New York City, for General Navigation Inc.; James L. Garrity, William R. Grimes, New York City, of counsel.

### OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

Margarine Verkaufsunion G.m.B.H. (Margarine), the consignee of a shipment of prime cottonseed oil, seeks to recover damages for short delivery and contamination of part of the shipment. Recovery is sought from the vessel, M. T.G.C. Brovig (the Brovig), which carried the shipment from Houston to Rotterdam; her owner, Partrederiet Brovigtank, a Norwegian corporation; and General Navigation Inc., a domestic corporation and the vessel's charterer under a Tanker Voyage Charter Party entered into with the owner. General Navigation, by a similar charter, subchartered the vessel to Lever Bros. Co., the shipper of the cargo, but Lever Bros. is not named as a defendant.[1] General Navigation, in the event it is held liable, seeks indemnity from Partrederiet Brovigtank for breach of its warranty under the charter party to supply a seaworthy vessel at the start of the voyage.

On May 30 and 31, 1964, at Houston, Texas, the Brovig was loaded with 3,575.11 long tons of prime crude cottonseed oil in her Nos. 4 and 5 port and starboard tanks and No. 7 center tank.[2] From Houston the vessel proceeded to New Orleans, where an additional cargo of peanut oil and lard was loaded into other tanks. The ship then sailed for Rotterdam on June 4 in weather that remained good until June 7, when heavy weather was encountered, which continued through the next day. After a quieter day on June 9, the weather conditions became very irregular on June 10, with the wind and sea going in different directions. According to the master, the sea was higher than the wind warranted, and the wracking and confused sea caused the vessel to roll, pitch and strain with heavy seas washing over her decks. At 11 a. m., due to the strain on the vessel, the captain was forced to change course and reduce speed. At about 11:30 a. m. a sharp report like a pistol shot was heard. While no investigation was then feasible because of the heavy sea, a cursory examination did not re-

---

1. Margarine, the consignee and purchaser of the shipment, and Lever Bros. Co., the shipper and seller, are subsidiaries of the same parent corporation, Unilever, Inc.

2. Of the total, 890.13 tons were loaded in the No. 5 port wing tank.

veal any cracks in the deck plates. The next day, June 11, an oil film in the wake of the ship was observed, but the heavy seas and the rolling of the vessel still precluded thorough inspection until June 12, when the weather finally subsided enough to permit the captain to stop the vessel. An investigation revealed that oil was seeping from the No. 5 port wing tank. Approximately 250 long tons of cottonseed oil that appeared to be above sea level were then shifted to the No. 8 port wing tank, and the balance was pumped into the No. 2 port wing tank. En route to Rotterdam, the No. 5 port wing tank filled to sea level with salt water. At Rotterdam the Brovig discharged the shipment in suit and her other cargo at another port; she was thereafter drydocked at Birkenhead, England, where further inspection revealed that hull plate E8, in the way of the bilge of No. 5 port wing tank, had been cracked vertically over its entire length.

Plaintiff alleges that seawater entered the No. 5 port wing tank and that the portion which had been pumped into the Nos. 2 and 8 tanks was in contaminated [3] condition upon discharge at Rotterdam; also, that as a result of the crack, a portion of the cottonseed oil was lost overboard and consequently there was a shortage of discharge. Plaintiff contends that the contamination and shortage were due to the defendants' failure to exercise due diligence to make the No. 5 port wing tank seaworthy when the vessel sailed from Houston and New Orleans,[4] and to their overloading the Brovig beyond her maximum mean draft, thereby making her, ipso facto, unseaworthy.[5] The defendants contend that they exercised due diligence to make the vessel seaworthy;[6] that the plate crack was caused by perils of the sea[7] or a latent defect not discoverable by due diligence;[8] and finally, they deny the charge of overloading.

■■ The question of who bears the burden of proof on these issues turns on whether or not the Carriage of Goods by Sea Act[9] ("COGSA" or the Act) is applicable and controls the rights and liabilities of the parties. Somewhat inconsistently with their pleaded defenses, the defendants dispute that "COGSA" is applicable on the ground that plaintiff, the consignee, and Lever Bros. Co., the shipper, are subsidiaries of Unilever, Inc., and the transaction between them merely involved a transfer between corporate affiliates and accordingly, that the bill of lading never became a document of title sufficient to give the plaintiff the status of a shipper under the Act.[10] The

3. The defendants do not dispute that the contents of No. 2 tank were contaminated due to seawater, but deny that the No. 8 tank contents were contaminated. They contend the plaintiff or its representatives were at fault in that they negligently intermixed the contents of both tanks upon discharge at Rotterdam into a single shore tank instead of segregating them into separate shore tanks. In view of the exoneration of the defendants from liability, the court does not reach this issue which pertains to damages.

4. 46 U.S.C. § 1303(1) (a), (c).

5. 46 U.S.C. § 85 et seq.

6. 46 U.S.C. § 1304(1).

7. 46 U.S.C. § 1304(2) (c).

8. 46 U.S.C. § 1304(2) (p).

9. 46 U.S.C. § 1300 et seq.

10. 46 U.S.C. § 1300. The bill of lading incorporates "COGSA" only "if this

bill of lading is a document of title." The defendants' argument, if sustained, would place the burden of proof upon the plaintiff, since the bill of lading would not be a document of title, but only a memorandum incorporating the charter party terms by reference. The charter party provides that "[t]he tanks having been inspected by the Charterer's inspector as to cleanliness and tightness * * * neither the vessel nor the owner shall be liable for loss or damage due to contamination * * * or leakage unless there is negligence on the part of the vessel." Any claim for alleged breach of the charter party rests upon the party asserting it. Cf. Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 108–110, 62 S.Ct. 156, 86 L.Ed. 89 (1941); Lucayan Transports, Ltd. v. McCormick Shipping Corp., 188 F.2d 202, 205 (5th Cir. 1951); Flat-Top Fuel Co. v. Martin, 85 F.2d 39, 41 (2d

defendants' argument that "COGSA" does not apply, however, is without substance. The mere fact that a transaction is between corporate affiliates does not remove it from the protection of "COGSA", especially when there is no claim, much less no evidence, of an intent to commit a fraud or to violate a statutory duty to justify piercing the corporate veil.[11] The evidence indicates an arms-length, commercial transaction between the two subsidiary corporations. The bill of lading in question was a negotiable "on board" freight paid instrument, and was fully negotiated to plaintiff, which made final payment for the shipment on June 10, 1964, ten days before the outturn of the cargo in Rotterdam. Under these circumstances, the bill of lading became a document of title, bringing the plaintiff under the protection of "COGSA".[12]

The law is settled under "COGSA" that the cargo owner in the first instance bears the burden of proof that the shipment was delivered to the vessel in good order and condition and was outturned in damaged condition. Since the plaintiff has established delivery of the cargo of cottonseed oil to the Brovig at New Orleans in good condition and outturn at Rotterdam of a part thereof in contaminated condition, it has made out a prima facie case. The burden then shifts to the carrier defendants, and if they are to be absolved of liability, they must prove that the loss occurred through the operation of an excepted cause under the Act or that they exercised due diligence to avoid and prevent the harm.[13] Plaintiff, however, contends that defendants cannot avail themselves of the "COGSA" defenses of perils of the sea or latent defect unless they first establish that they exercised due diligence to make the tanks watertight and suitable for the carriage of the cottonseed oil. It is unnecessary to resolve the legal issue posed by plaintiff, which is of doubtful validity,[14] since the court finds, upon all the evidence, (1) that the defendants complied with the statutory requirement of due diligence to make the vessel seaworthy and the tanks fit for the reception and carriage of the shipment of cottonseed oil, and (2) that the cause of the contamination by seawater of a portion of the shipment was a crack in the E8 bilge plate of the No. 5 port wing tank, which developed during heavy weather encountered on the high seas en route to Rotterdam, due to a latent defect not discoverable by due diligence. While the defendants also rely upon a separate defense of perils of the sea to exonerate them from liability, this has not been established as an independent cause of the damage, although the evidence does justify a finding that the heavy weather was a con-

Cir.), cert. denied, 299 U.S. 585, 57 S.Ct. 110, 81 L.Ed. 431 (1936) ; The Fort Gaines, 21 F.2d 865, 866 (D.Md.1927) ; The Nordhvalen, 6 F.2d 883, 886 (D. Md.1925).

11. Cf. Fisser v. International Bank, 282 F.2d 231, 238 (2d Cir. 1960).

12. Cf. Jefferson Chemical Co. v. M/T Grena, 292 F.Supp. 500, 504 (S.D.Tex. 1968) ; North Am. Steel Prods. v. Andros Mentor, 1969 A.M.C. 1482 (S.D.N.Y. 1969).

13. M. W. Zack Metal Co. v. S.S. Birmingham City, 311 F.2d 334, 337 (2d Cir. 1962), cert. denied, 375 U.S. 816, 84 S.Ct. 50, 11 L.Ed.2d 51 (1963) ; Lekas & Drivas, Inc. v. Goulandris, 306 F.2d 426, 429 (2d Cir. 1962) ; Schroeder Bros., Inc. v. The Saturnia, 226 F.2d 147, 149 (2d Cir. 1955) ; Edmond Weil, Inc. v. American West African Line, 147 F.2d 363, 366 (2d Cir. 1945) ; Levatino Co. v. M/S Helvig Torm, 295 F.Supp. 725, 729–730 (S.D.N.Y.1968). See also Schnell v. The Vallescura, 293 U.S. 296, 303–307, 55 S.Ct. 194, 79 L.Ed. 373 (1934).

14. Cf. Lekas & Drivas, Inc. v. Goulandris, 306 F.2d 426, 432 (2d Cir. 1962). Accord, Cia Atlantica Pacifica, S.A. v. Humble Oil & Refining Co., 274 F.Supp. 884, 904–905 (D.Md.1967) ; see also Mamiye Bros. v. Barber S.S. Lines, 241 F.Supp. 99 (S.D.N.Y.1965), aff'd, 360 F.2d 774 (2d Cir.), cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966) ; Isbrandtsen Co. v. Federal Ins. Co., 113 F.Supp. 357 (S.D.N.Y.1952), aff'd, 205 F.2d 679 (2d Cir.), cert. denied, 346 U.S. 866, 74 S.Ct. 106, 98 L.Ed. 377 (1953).

tributing factor in causing the fracture.[15]

In September, 1963, nine months before the voyage in suit, the Brovig was drydocked for her annual required inspection at Antwerp. A Lloyd's surveyor inspected the vessel's sides, decks, bottom and rudder. He performed the usual tests for hull seaworthiness, making a visual examination of all plates to see if they were corroded, fractured or had leaking rivets, and hammer testing those plates that showed signs of corrosion, which did not include the No. 5 port wing tank.[16] In terms of his experience, which was considerable and impressive, the Lloyd's surveyor was of the view that the tests applied were adequate to reveal whether or not anything was wrong with the plates; that in fact they were in good condition; and that the vessel was seaworthy. Lloyd's, based upon the surveyor's recommendation, continued the Brovig in class and issued the appropriate certificate. The ship's master, who was present during the inspection, was also of the view that the ship was "completely seaworthy." The examination and testing of the vessel by Lloyd's competent and experienced surveyor constituted due diligence to make the vessel and her tanks seaworthy, and nothing that occurred thereafter until the time she set sail from Houston and New Orleans requires any different finding.[17]

Immediately prior to the voyage in suit, the vessel discharged a cargo of molasses on May 22, 1964, at Groton, Connecticut. Thereafter, all tanks were butterworthed and then hand cleaned, since they had to be absolutely clean to receive the oil cargo. The captain personally inspected the tanks and saw no leaks; in his opinion they were completely watertight. Upon arrival of the Brovig at Houston on May 30, the tanks that were designated to carry the cottonseed oil cargo, including the No. 5 port wing tank, were inspected by surveyors appointed by Lever Bros. Co., who found them clean, dry and suitable to receive the shipment. The surveyor's inspection required him to go inside the tanks to check the bottom, and he testified that had there been any leaks in the bottom or below the water line on the outside plate, he would have noticed them. He noticed none. He also testified that the tank was free from corrosion and excessive rust. Following the surveyor's approval of the designated tanks, the oil was loaded and the Brovig proceeded to New Orleans, where, after taking on the additional cargo, she sailed on June 4 for Rotterdam. As already noted, she continued without incident until June 7, when she struck heavy spells of weather, which reached their worst on June 10 from 1100 to 1420 hours. She encountered northerly winds, force 6 on the Beaufort scale, and a sea force of 7 on the Douglas scale. It was at 11:30 a. m. that the sound "like a pistol shot" was heard, but the rough weather and heavy seas prevented hull inspection until June 12, when the crack in a plate of the No. 5 port wing tank was found.

It was upon the subsequent inspection toward the end of June by Lloyd's sur-

15. Balfour, Guthrie & Co. v. American-West African Line, 136 F.2d 320, 321 (2d Cir. 1943), cert. denied, Balfour, Guthrie & Co. v. The Zarembo, 320 U.S. 804, 64 S.Ct. 437, 88 L.Ed. 486 (1944). Cf. The Floridian, 83 F.2d 949, 950 (2d Cir.), cert. denied, Roberts Brining & Co. v. The Floridian, 299 U.S. 577, 57 S.Ct. 41, 81 L.Ed. 425 (1936); The Warren Adams, 74 F. 413, 415–416 (2d Cir.), cert. denied, 163 U.S. 679, 16 S.Ct. 1199, 41 L.Ed. 316 (1896).

16. The surveyor hammer tested No. 6 and No. 7 center tanks, which had leaking rivets that were repaired.

17. Cf. The Floridian, 83 F.2d 949, 950–951 (2d Cir.), cert. denied, Roberts Brining & Co. v. The Floridian, 299 U.S. 577, 57 S.Ct. 41, 81 L.Ed. 425 (1936); see also Balfour, Guthrie & Co. v. American-West African Line, 136 F.2d 320, 321 (2d Cir. 1943), cert. denied, Balfour, Guthrie & Co. v. The Zarembo, 320 U.S. 804, 64 S.Ct. 437, 88 L.Ed. 486 (1944); The Emilia, 13 F.Supp. 7, 9 (S.D.N.Y. 1935).

veyor, representatives of the owners and underwriters and the ship's master at drydock in Birkenhead, that the crack was ascertained to be at the turn of the bilge in hull plate E8. All testified it was a simple and clean break running vertically across the entire plate. The master's description was that it appeared as if it had been cut with a sharp knife and that it measured in width about one-half to two inches. The witnesses were also in accord that the edges of the crack were clean; that there was no rust, corrosion, pitting or wastage; that the plate itself was in good shape. All the evidence indicates it was a recent fracture and was preceded by no warning signs. The plate was gauged by a shipyard employee in the presence of the surveyor and was 75/100″ thick, only 2/100″ less than its measurement when new. Upon recommendation of the Lloyd's surveyor, the cracked portion of E8 and part of E7, the plate ahead of it, were cropped and replaced by an insert about eight or nine feet.[18] Defendants' expert, whose testimony I find credible and acceptable, was of the opinion that plate E8 sustained a brittle facture which resulted from a defect in the metal, discoverable only through a destructive test of the plate.[19] Such a fracture is instantaneous, occurs just as it did in the instant case, with a loud report, and is caused by substantial but not extraordinary stress imposed by a heavy sea—in sum, there was a latent defect in the plate. Upon all the evidence, the defendants' expert's opinion is the only reasonable explanation for the fracture.

The crucial question on the issue of latent defect is whether it could have been discovered by due diligence before the event—essentially, whether it was discoverable by any reasonable and customary test or inspection before the Brovig set sail for Rotterdam.[20] Since the plate was already in the vessel, it was not possible to give it a physical or chemical test for brittleness. Nothing about the condition of the plate prior to her sailing suggested, in common experience, any of the tests which plaintiff, with hindsight judgment, urges should have been used. Hose and hammer tests, which cover only small areas, are usually employed only if some visible defect attracts attention, as was the case here in the instance of the No. 6 and No. 7 center tanks. Lloyd's requires hydrostatic tank testing for water tightness every four years, but in the interim period such tests are performed only if some circumstance suggests a defect in a tank. The instant case is significantly different from cases relied upon by the plaintiff,[21] where pitting, corrosion and general deterioration of the cracked plates at or near the point of fracture

18. Lloyd's surveyor testified that had the plate been corroded, he would have recommended doubling and renewing it.

19. The expert ruled out other types of fracture: a fatigue fracture, which grows "very slowly and silently because of repeated applications of stress," and a ductile fracture "due to overstressing, but at such a rate of speed that the metal fails in ductile fashion. It deforms and pulls." For a discussion of brittle and ductile fractures, see Federazione Italiana Dei Corsorzi Agrari v. Mandask Compania De Vapores, S.A., 388 F.2d 434, 438 (2d Cir.), cert. denied, 393 U.S. 828, 89 S.Ct. 92, 21 L.Ed.2d 99 (1968).

20. Cf. Peter Paul, Inc. v. Rederi A/B Pulp, 258 F.2d 901, 905–906 (2d Cir. 1958), cert. denied, 359 U.S. 910, 79 S.Ct. 586, 3 L.Ed.2d 574 (1959); The Quarrington Court, 122 F.2d 266, 267 (2d Cir. 1941); The Toledo, 122 F.2d 255, 256 (2d Cir.), aff'g, 30 F.Supp. 93, 99 (E.D.N.Y.1939), cert. denied, Isbrandtsen-Moller Co. v. The Toledo, 314 U.S. 689, 62 S.Ct. 302, 86 L.Ed. 551 (1941); National Sugar Refining Co. v. Motorship Las Villas, 225 F.Supp. 686, 689 (E.D.La.1964); Alcoa S.S. Co. v. United States, 94 F.Supp. 406, 407 (S.D.N.Y. 1950).

21. E. g., General Motors Corp. v. The Olancho, 115 F.Supp. 107 (S.D.N.Y.1953), aff'd on opinion below, 220 F.2d 278 (2d Cir. 1955); Huilever, S.A. Division Huileries Du Congo Belge v. The Otho, 139 F.2d 748 (2d Cir.), cert. denied, American West African Line v. "Huilever" S.A. Division Huileries Du Congo Belge, 322 U.S. 735, 64 S.Ct. 1047, 88 L.Ed. 1568 (1944).

indicated that the defects could have been discovered by the exercise of due diligence. The Brovig manifested none of these symptoms. The evidence establishes that the Brovig's hull was thoroughly and competently inspected at drydock in September, 1963, and that adequate follow-up tests were applied thereafter whenever called for. Plaintiff has failed to suggest any further practicable tests that could have been performed.[22]

To counter the testimony of those who observed the cracked plate at drydock and the opinion of the defendants' expert, the plaintiff urges that the court draw an adverse inference from the defendants' failure to retain the cropped portion for definitive tests or the making of a plaster cast. However, the four witnesses—Lloyd's surveyor, the owner and underwriters' representatives, and the master of the vessel—fully described the condition of the plate, and (perhaps eliminating the master, who it may be claimed was an interested witness)[23] there is not the slightest basis to challenge their veracity or to ascribe any motivation to them to deviate from the truth. The cropped piece was discarded as a matter of course[24] and there is no reason to suggest why Lloyd's or any of the parties involved should have had litigation in mind and retained it for such purposes. As one defense witness put it: "When we surveyors go into a drydock, normally we don't look forward to courtroom scenes like this. We do an engineering job." Upon this record there is no basis for imputing, as plaintiff urges, a sinister purpose to the defendants because the cropped portion of

the plate was not retained, or to draw any adverse inference in consequence.[25]

Plaintiff also seeks to repel the persuasive testimony of the defense by the opinion of its expert that the proximate cause of the crack was the loading of the Brovig beyond her maximum capacity when she sailed from New Orleans. The court, in the instance of this expert (as in the case of the defendants' expert), had the benefit of his demeanor testimony.[26] It appeared to this court that the plaintiff's expert started from a conclusion that the Brovig was overloaded and then, to sustain it, worked backwards on a series of unwarranted assumptions. His testimony, to say the least, left much to be desired. Moreover, the defendants adequately proved that the vessel was not overloaded on departure by recordings in the ship's log, which were corroborated by the report of the bulk oil surveyors appointed by the shipper. The log book listed the ship's mean draft as thirty feet, one inch on leaving New Orleans, which was five inches below her maximum summer mean draft for fresh water ports, while the oil surveyors' report listed a slightly lower figure, to wit, twenty-nine feet, one inch. Even the plaintiff's expert witness testified that the ship's reported draft in New Orleans was consistent with the ship's reported total dead weight on departure. At no point did the expert indicate that the basis of his challenge to the defendants' figures was anything but hypothetical—indeed, in some instances, and entirely without any evidential basis, he disregarded log entries. The factual evidence advanced by

---

22. *Cf.* Balfour, Guthrie & Co. v. American-West African Line, 136 F.2d 320, 321 (2d Cir. 1943), cert. denied, Balfour, Guthrie & Co. v. The Zarembo, 320 U.S. 804, 64 S.Ct. 437, 88 L.Ed. 486 (1944).

23. *Cf.* Megarry Bros. v. United States, for the Use of Midwestern Elec. Constr., Inc., 404 F.2d 479, 487 (8th Cir. 1968); Noseworthy v. City of New York, 298 N.Y. 76, 79–80, 80 N.E.2d 744 (1948); Gaffney v. New York Cons. R. R., 220 N.Y. 34, 37, 114 N.E. 1047 (1917).

24. The evidence was uncontradicted that under a customary term of the ship's repair contract, the cropped plate became the property of the shipyard, and that, absent unusual circumstances not here present, the preservation of the scrap piece was neither customary nor practicable.

25. *Cf.* Reynolds v. Denver & Rio Grande Western R. R., 174 F.2d 673, 675 (10th Cir. 1949).

26. *Cf.* Dyer v. MacDougall, 201 F.2d 265 (2d Cir. 1952).

the defendants is far more persuasive than the hypothetical projections urged by the plaintiff. Upon all the evidence, the court finds that the Brovig was not overloaded when she left New Orleans.

Alternatively, and again based upon its expert's opinion, plaintiff contends that if the Brovig was not overloaded, then she was structurally unsound—to use his language, "she was on the way to breaking up," and that this subjected the vessel to extra stress or over stress, which caused the plate to crack. The expert's opinion is at such variance with the observation and judgment of Lloyd's surveyor and other experienced personnel who inspected the vessel after the occurrence as to require its rejection. There is no basis upon this record to challenge their testimony that after repairs to the minor and not unusual damages caused by heavy weather (upon which the expert predicated his judgment) the vessel was sound and seaworthy—in fact, it was fit to retain Lloyd's classification.

The foregoing, together with the facts the parties stipulated are not in dispute set forth in items 3(a) (1) through 3(a) (6) of the pretrial order shall constitute the Court's Findings of Fact and Conclusions of Law. Judgment may be entered accordingly.